UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ABIGAIL JERLES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:19-cv-00856-TWP-DML |
| ) | |
| STALLARD & ASSOCIATES, INC., ) | |
| ) | |
| Defendant. ) | |

**ENTRY DENYING MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Defendant Stallard & Associates, Inc.'s ("Stallard") Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 (Filing No. 45). Plaintiff Abigail Jerles ("Jerles") filed an Amended Complaint against Stallard, her former employer, alleging violation of Title VII and the Pregnancy Discrimination Act, and retaliation (Filing No. 7). Stallard now asks the Court for summary judgment on both claims, arguing the case presents no disputed issues of fact and that it is entitled to judgment as a matter of law. Also pending is Jerles' Motion for Leave to File a Surreply (Filing No. 59). For the following reasons, Stallard's summary judgment motion is **denied** and Jerles' request for leave to file a surreply is **denied as moot**.

### I.     BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Jerles as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Defendant Stallard is a property management company owned by husband and wife Greg ("Greg") and Joanna ("Joanna") Stallard. (Filing No. 47-1 at 6-7.) Greg primarily runs the business while Joanna fills in and helps as needed. *Id.* Jerles has a Bachelor of Science degree in Apparel Merchandising from Indiana University. (Filing No. 50-1 at 6-7.) In April 2016, Jerles responded to an advertisement of an open position in "administrative and payables" that Stallard had posted to Craigslist. (Filing No. 47-3 at 16-17.) Throughout the application and interview process, Jerles believed the position would not be public-facing, and that her duties would involve accounting and paperwork. *Id*. at 26. Stallard hired Jerles, but on her first day Joanna told her that she would be sitting at the front desk for the first few weeks. *Id.* at 24.

Joanna testified that she hired Jerles to take over the "payables" position. (Filing No. 47-1 at 12.) Jerles' initial duties were learning that position and performing various administrative tasks such as answering telephones and emails. *Id.* at 11; Filing No. 47-3 at 24. Joanna was her immediate supervisor, but Jerles believed that Joanna was trying to transition out of that role and to be in the office less frequently. (Filing No. 47-3 at 27-28.)

On July 13, 2016, Greg and Joanna gave Jerles a 90-day review. They reported that Jerles was performing at an average level in five categories of work performance and average to below average in two others. (Filing No. 47-1 at 17; Filing No. 47-3 at 141-42.) They stated that Jerles had a "slight" problem with tardiness but that she has "successfully learned the tasks required to run the front desk" and had "learned most all tasks required for accounts payable." *Id.* Under "strengths," the review noted that "Abbi is smart and hardworking employee that is well liked by co-workers. She understands duties and requirement of the position." *Id.* at 142. The "weakness" section revealed that Jerles had trouble handling pressure and needed to pay closer attention to detail. *Id.* Following the review, Jerles received a pay rate increase to $14.00 per hour. *Id.* Within

nine months of that review, Joanna gave Jerles another raise—to $15.00 or $16.00 per hour. (Filing No. 50-2 at 16.) Joanna approved the raise "because [Jerles] had done a good job and I felt a raise was due." *Id.* at 17.

On April 17, 2017, Jerles received her one-year review, which was given by Joanna. *Id.* at 13; Filing No. 47-3 at 143-44. At the same time, she received a raise to $16.50 per hour. (Filing No. 50-2 at 15-16; Filing No. 47-3 at 143-44.) The review was generally positive, and at the bottom, under "Accomplishments and overall strengths," Joanna wrote:

> Wow – what an amazing year! Abbi was hired as a receptionist a year ago; moved to (and learned) [Accounts Payable]; and as of January, moved to H/R. Abbi is very smart and is well liked by co-workers. She has a great understanding of the office and how it functions, and has stepped up to take on [Accounts Payable], and as of January, this H/R position. She is learning this position and coming along very well. Abbi is a hard worker and is a valuable asset to our company and we are very proud of how much she has accomplished this year.

(Filing No. 47-3 at 145.)

In April 2017, Jerles began receiving fertility-related medical treatment. *Id.* at 44-45. At the instruction of her healthcare provider, she began following the Creighton Model Fertility Care System, which involves observation and charting of biological markers to determine how and when to achieve pregnancy. *Id.* at 44. Strict adherence to this course of treatment required Jerles to attend an appointment with her healthcare provider every two weeks. *Id.* at 46. Shortly after the first of these appointments, Jerles met with Joanna to discuss whether it would be possible for her to take time off to attend these appointments every two weeks.[1] (Filing No. 50-1 at 29-30.) Joanna was sympathetic and allowed Jerles to take time off for these appointments as long as she

---

[1] There is conflicting evidence about whether Joanna, and later Greg, knew the appointments were for fertility treatment or if they believed the appointments were for an unspecified health issue. For summary judgment purposes, Stallard does not dispute that Joanna knew between April and August of 2017 the appointments were for fertility counseling. (Filing No. 46 at 7.) In resolving this motion, the Court assumes that the purpose of these doctor's visits was revealed to Joanna in April 2017 and to Greg in July 2017 because that is the evidence most favorable to Jerles.

informed her co-workers of when she would be absent. (Filing No. 50-2 at 48.) Jerles did so, and for a few months these appointments did not seem to cause a problem. (Filing No. 50-1 at 14-15.)

In July 2017, Greg was caught off-guard by one of Jerles' absences and Joanna informed him that Jerles needed to regularly miss work for doctor's visits. (Filing No. 50-2 at 46-47.) On July 14, 2017, Greg sent a memo to Joanne titled "Greg concerns i7-7-2017." (Filing No. 50-13.) The first point of the memo stated: "Need to establish another full time person that can do what Abbi does and what Ryan did in office, plus hopefully take on some Greg tasks. Concern is if Abbi gets pregnant or her/Shannon leave we are in a mess." *Id.* at 3. Joanna did not agree with Greg that Jerles' pregnancy would leave Stallard in a mess, but understood that the company would need to find a way to handle her maternity leave if she were to become pregnant. (Filing No. 50-2 at 26-27.)

On July 28, 2017, Greg wrote a memo to Jerles titled "Recent concerns & conversations." (Filing No. 47-3 at 153.) The memo expressed concerns about Jerles' recent absences and her upcoming one-week vacation she had planned in August for her wedding and honeymoon. *Id.* It stated, "I understand from Joanna that you are working on some health issues and we expect you to take care of those concerns. However, I feel that you have started taking advantage on some issues." *Id.* The memo instructed that Jerles should only miss time for medical appointments in the morning, not in the afternoon, and that she needed to be in the office in time to help with lunch rotation. *Id.* It also instructed her not to take any time off for leisure until she had accumulated more paid time off. *Id.* As a consequence of this memo, Jerles cancelled all her future fertility appointments for fear of losing her job. (Filing No. 47-3 at 99.) Joanna testified that she was unaware of any issues with Jerles taking time off after July 28, 2017. (Filing No. 50-2 at 50.)

4

Jerles took her scheduled vacation in August for her honeymoon, and her employment continued smoothly for that summer and into early fall. (Filing No. 47-3 at 77.)

In the fall Jerles became pregnant and was faced with the issue of how to inform her employer and co-workers. The first person she told, on October 13, 2017, was a part-time accounting co-worker, Shannon Hentz ("Hentz"). (Filing No. 50-3 at 4.) Jerles told Hentz that "she was afraid to announce her pregnancy to Stallard & Associates, because she was afraid she might be fired." *Id.* Hentz told her not to worry because an employer could not fire an employee due to pregnancy. *Id.* On October 31, 2017, Jerles announced her pregnancy to the entire office, including Greg. (Filing No. 50-1 at 22.) Joanna was not in the office for the announcement, but Greg relayed the news to her later that day. (Filing No. 50-2 at 54.)

In the immediate aftermath of that announcement, Stallard did two things relevant to Jerles' claims. First, Greg told Jerles and Hentz that he wanted them to be "cross-trained" in their respective positions so they could each perform the other's duties. (Filing No. 50-3 at 5.) Jerles was already trained to do Hentz's work, as she had trained Hentz when she began employment at Stallard. *Id.* The effect of Greg's request was that Hentz would become trained to do Jerles' job. One day, while Jerles was out at lunch, Greg stopped by Hentz's desk and reiterated his request that the two cross-train, mentioning it was important "to ensure that Abbi's pregnancy 'goes smoothly.'" *Id.*

Second, in the weeks following Jerles' announcement, Stallard published several full-time job postings. On November 13, 2017, Stallard created a job posting on the website Indeed for a "Bookkeeper/Office Manager." (Filing No. 47-1 at 122-24.) On November 27, 2017, he created a posting, again on Indeed, for "Accounts Payable/Payroll" position. *Id.* at 127-29. And on December 8, 2017, Stallard created a job posting in hopes of hiring an "Admin for Accounting &

5

HR Departments." *Id.* at 130-132. On Friday, November 17, 2017, Jerles and Hentz became aware that Greg was interviewing employees for an accounting position and shortly thereafter discovered the November 13, 2017 job posting. ([Filing No. 50-3 at 5-6](#).) The two became suspicious that Stallard planned to discharge Jerles, move Hentz into Jerles' role, and then hire a new employee to fill Hentz's old accounting position. *Id.* at 6.

Hentz believed that course of action would be unfair to Jerles, punishing her for becoming pregnant. *Id.* Hentz resolved to resign the following Monday, November 20, 2017, out of solidarity with Jerles. *Id.* When Hentz arrived at the office that morning, Greg instructed her to give herself a $1.00 per hour raise. *Id.* Hentz knew that doing so would put her at a higher pay rate than Jerles, who had been working at the company a year longer than Hentz. *Id.* Rather than accept the pay increase, Hentz informed Greg that she intended to leave the company in two weeks. *Id.* Hentz did not explain to Greg that she was resigning because of what she felt was Stallard's unfair treatment of Jerles, believing that doing so might lead to retaliation against Jerles. *Id.*

On November 20, 2017, the day Hentz informed Greg she would be leaving, Joanna discussed the consequences with Jerles. She told Jerles not to worry—Joanna would take over Hentz's duties for the time being. ([Filing No. 47-1 at 40-41](#).) She then asked Jerles how long she planned to take for maternity leave, to which Jerles replied that she intended to take eight weeks. *Id.* at 41. Joanna asked Jerles if she planned to return, and Jerles said that she did. *Id.* There was some mention of Jerles being a part-time employee when she returned, but the parties dispute who raised this idea and how seriously it was taken. *Id.*; [Filing No. 47-3 at 80](#).

After Hentz resigned, Stallard hired two new employees. On December 4, 2017, Stallard hired Damon McKinnon ("McKinnon") to fill an HR role, and on December 12, 2017, Stallard hired Nicole Barker ("Barker") for the "accounts payable position." ([Filing No. 47-1 at 45](#), 53.)

6

Joanna informed Jerles that Stallard was looking to hire a second person, Jerles' response was to ask what work would be left for her to do when the two employees came on board. *Id.* at 65. Joanna responded that it was unlikely that both employees would stay at the company long-term, and if they did Jerles would take on other responsibilities such as overseeing inventory. *Id.* Jerles informed both Joanna and Greg that she felt she was being replaced due to her pregnancy, but Jerles never used the word "discrimination" during these conversations. (Filing No. 47-3 at 21.) Joanna reassured Jerles that she would have a job when she returned from maternity leave, although it may not be the accounting or HR role that Jerles had done in the past. *Id.* at 116.

In an e-mail to staff on December 20, 2017, Joanna introduced McKinnon as taking over payroll tasks and Barker as taking over payables. *Id.* at 179. In the same email, Joanna wrote:

> Abbi is still with us. She will be taking a few months off this summer for maternity leave, so we are preparing for that. In the meantime, she will be working with Damon and Nicole to help train and as support. She will be taking on different tasks as Damon and Nicole learn their jobs, and when she returns from maternity leave.

*Id.* At the time she wrote that email, Joanna was under the impression that Jerles intended to continue working at Stallard after her maternity leave and that the company "had tasks available if she could do them." (Filing No. 47-1 at 62.) After hiring McKinnon and Barker, Joanna moved Jerles back to the front desk and changed her email address from accounting@stallardonline.com to frontdesk@stallardonline.com. (Filing No. 50-7 at 2.) Later, Jerles was assigned to the accounting2@stallardonline.com account and instructed to monitor both that address and the front desk address. (Filing No. 47-3 at 56.)

Beginning in December 2017, after she hinted that she was being discriminated against due to her pregnancy, Greg and Joanna began to treat Jerles differently, reprimanding her for slight infractions or responding tersely or not at all to Jerles' emails. (Filing No. 47-3 at 119.) On February 23, 2018, Joanna instructed Jerles via email to respond to some discussion points for her upcoming

7

yearly performance review, including what role Jerles saw herself in moving forward. (Filing No. 47-1 at 139-140.) Jerles did so the very next day, but rather than responding to her, Joanna forwarded her email to Greg with this added commentary: "Just FYI. This was what she sent that I'm dealing with." *Id.* Greg replied, "She just does not get it." *Id.* The two-year anniversary of Jerles' employment came and went without a performance review.

Jerles felt that she was being squeezed out because of her pregnancy and reported that information to the Equal Employment Opportunity Commission ("EEOC"). She initially tried to make an appointment in December of 2017 or January of 2018 when Stallard hired McKinnon and Barker. (Filing No. 50-1 at 27-28.) But it took her several months to get an appointment, so she did not end up meeting with anyone from the EEOC until April 10, 2018. *Id.* On that day, she filed an EEOC Charge alleging that Stallard was discriminating against her based on sex, specifically because she was pregnant. (Filing No. 47-3 at 150.) Jerles continued to work at Stallard through Friday, April 20, 2018. *Id.* at 102.

On Monday, April 23, 2018, Jerles went to a regularly scheduled checkup. *Id.* at 121. The doctor found she had high blood pressure and instructed her not to return to work that week because of the stress it was causing her. *Id.* Jerles emailed Greg to inform him she would be out for the week, and Greg forwarded that email to Joanna. (Filing No. 50-9.) Neither responded to Jerles. (Filing No. 47-1 at 122.)

On Wednesday, April 25, 2018, Jerles gave birth to a baby girl. (Filing No. 47-3 at 122-23.) Jerles emailed Greg to let him know that she had gone into labor early and her maternity leave would have to begin earlier than planned, but she received no response. *Id.* at 123; Filing No. 47-3 at 178.) Because she and Joanna had discussed an eight-week maternity leave, Jerles anticipated returning to work on June 18, 2018. (Filing No. 47-1 at 124.)

8

On May 14, 2018, while Jerles was on maternity leave, Stallard responded to her EEOC Charge. Its response said that Jerles' job was "in jeopardy." ([Filing No. 47-3 at 151](#).) Based on that language in response to an EEOC charge, Jerles amended her EEOC charge to add a claim for retaliation. *Id.* On June 5, 2018, Jerles emailed Greg and McKinnon, stating, "my 8 weeks will be up around June 18th so we will need to discuss when you would like me to return." ([Filing No. 50-10](#).) She received no response. ([Filing No. 47-3 at 124](#).) As of June 5, 2018, Stallard had not decided whether Jerles would return, but at that time the principals began to seriously discuss it. ([Filing No. 50-2 at 68](#).)

On June 11, 2018, Barker informed Stallard that her last day with the company would be June 22, 2018. ([Filing No. 50-15](#).) She wrote that other employees were trained to do her job duties "and with Abbi returning soon, I think the transition should move smoothly." *Id.* But it turned out that Jerles would not be returning soon—on June 17, 2018, she received the following message from Joanna:

> Shannon Russell reached out to us about your message and mentioned that you were planning to be at work Monday morning. You should **not** return to work on Monday. We will respond to your attorney's letter via our counsel. Shannon can still handle your COBRA election decision and any questions surrounding that specific topic.

([Filing No. 50-11](#)) (emphasis in original). This message was the first time Jerles was informed that she should not return to work on June 18, 2018. Jerles wrote to Greg on June 18, 2018 to inform him that she believed she still worked at Stallard since she had not resigned and the company had not terminated her, and that she planned to come in the following day, Tuesday June 19, 2018. Greg responded that Jerles was "not to return to work until your attorney has heard from our attorney that we have work for you to do. Should you elect to show up at work before hearing from our attorney you will be sent home immediately." ([Filing No. 50-12](#).) Jerles was never

9

allowed to return to work at Stallard and eventually came to understand that her employment had been terminated. (Filing No. 47-3 at 12.)

Jerles initiated this action on February 27, 2019 and filed an Amended Complaint alleging discrimination and retaliation on March 18, 2019 under Title VII of the Civil Rights Act of 1964, as amended, pursuant to 42 U.S.C. § 2000e-2 and 28 U.S.C. § 1331 ("Title VII"). (Filing No. 7.) On February 27, 2020, Stallard moved for summary judgment. (Filing No. 45.) That motion is now ripe for this Court's consideration.

## II. LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). A disputed fact must be "material," which means that it might affect the outcome of the case under the applicable substantive law. *Liberty Lobby*, 477 U.S. at 248. Disputes over irrelevant or unnecessary facts do not preclude summary judgment. *Id.* A genuine dispute of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan*

*Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox Cnty. Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

### III. DISCUSSION

As an initial matter, the Court will address Stallard's contention that Jerles failed to comply with Local Rule 56-1(b). This rule requires a non-movant, in its summary judgment response, to "include a section labeled 'Statement of Material Facts in Dispute' that identifies potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment." Jerles' brief contains such a section, but Stallard contends it is too cursory and void of record citations to comply with Rule 56-1. Stallard urges the Court to "deem this non-compliance as a concession to Defendant's properly established statement of undisputed facts." (Filing No. 54 at 3.)

The Court disagrees and declines to strike Jerles' version of the facts. Although the section in question is quite brief, Jerles' "Statement of Facts" section, which is almost 15 pages long, is sufficient to inform the Court of Jerles' understanding of the facts. The factual disputes in this case are limited, as Stallard acknowledges in its reply brief. *Id.* at 3-4. The Court finds that Jerles' response brief complies with Rule 56-1.

Stallard contends that it is entitled to judgment as a matter of law. Jerles' Amended Complaint alleges two claims—Title VII discrimination and retaliation. ([Filing No. 7](#).) The Court will address each claim separately.

### A. **Pregnancy Discrimination under Title VII**

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, condition, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "[T]he Pregnancy Discrimination Act…amended Title VII to state that discrimination 'because of sex' includes discrimination 'because of or on the basis of pregnancy, childbirth, or related medical condition.'" *Hall v. Nalco Co.*, 534 F.3d 644, 646 (7th Cir. 2008) (quoting 42 U.S.C. § 2000e(k)).

A plaintiff may show sex discrimination through a direct method or, as an alternative, indirectly through the burden-shifting mechanism established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 876 (7th Cir. 1999) (sex discrimination). Likewise, a plaintiff asserting discrimination on the basis of pregnancy, childbirth, or related medical conditions may prove such discrimination through either the direct or indirect method. *Griffin v. Sisters of St. Francis, Inc.*, 489 F.3d 838, 844 (7th Cir. 2007).

Under the indirect method, a plaintiff must prove that: "(1) she was pregnant and her employer knew she was pregnant; (2) she was performing her duties satisfactorily; (3) she was fired; and (4) similarly situated employees not in the protected class were treated more favorably." *Id.* If the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.

*Id.* If such a reason is given, the plaintiff can survive summary judgment only by showing that the reason is a pretext for intentional discrimination. *Id.* Furthermore,

> [t]he focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered. We do not sit as a superpersonnel department that reexamines an entity's business decision and reviews the propriety of the decision. Our only concern is whether the legitimate reason provided by the employer is in fact the true one.

*Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) (citations omitted).

"Alternatively, the plaintiff may proceed under the 'mixed motives' or direct method, in which case the plaintiff may avoid summary judgment by producing sufficient evidence, either direct or circumstantial, to create a triable issue as to whether pregnancy was a motivating factor in her discharge." *Marshall v. American Hosp. Ass'n*, 157 F.3d 520, 525 (7th Cir. 1998). In pregnancy discrimination cases, direct evidence of discriminatory intent "generally is in the form of an admission by a supervisor or decision maker that the employee was suspended because she was pregnant." *Kennedy v. Schoenberg, Fisher & Newman*, 140 F.3d 716, 723 (7th Cir. 1998).

Stallard acknowledges this framework for resolving a pregnancy discrimination claim but does not invoke the framework in its argument. Stallard's initial brief, rests on two premises: (1) "[Jerles] was not qualified for the accounting or management positions", and (2) "[t]here was no position available for [Jerles] when she asked to return." (Filing No. 46 at 16, 18.)

As to the first premise, the Court is unsure how it relates to the framework, and Stallard does not clarify. Under the "indirect method" for surviving summary judgment, the plaintiff must show that she was performing her job satisfactorily. The court views this as a different inquiry than whether the plaintiff is "qualified" for the job—the first question is answered by looking at performance reviews and testimony of the plaintiff's co-workers, while the second question seems to be answered merely by looking at the plaintiff's resume. Stallard focuses on the second question,

13

listing the credentials of the two employees it hired after Jerles announced her pregnancy and stating Jerles "was not qualified" for the positions those two employees occupied. *Id.* at 17-18. When arguing that Jerles cannot make a *prima facie* case, Stallard invokes a different framework—the framework for a failure to promote claim announced in *Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 377 (7th Cir. 1998). It is quite possible that Jerles cannot satisfy the *prima facie* criteria for a failure to promote claim, and perhaps that is why she did not plead one in her Amended Complaint. However, the framework Stallard invokes to argue that Jerles has not made a *prima facie* case is irrelevant to its Motion.

Second, Stallard asserts that "there was no position available for [Jerles] when she asked to return." Again, the Court does not see the usefulness of that assertion because Stallard fails to explain its relevance to the framework for analyzing the merits of a pregnancy discrimination claim. The Court is unsure how it relates to the direct method of proof or which element of the indirect method it is meant to negate. Moreover, the undisputed evidence shows that the premise is likely false because Barker announced a week before Jerles' return date that she would be leaving her position in two weeks.[2] (Filing No. 50-15.) Stallard's position seems to be that it terminated Jerles because it had no work she could do—the receptionist position had been eliminated and the two other positions Jerles had worked in (accounts payable and HR) had been usurped by two more qualified employees, Barker and McKinnon. (Filing No. 46 at 19.) That position is contradicted by the record, which shows that the accounts payable position Jerles had once held was vacated at almost the exact time she was due to return from maternity leave.

Stallard's brief in support of its Motion for Summary Judgment does not make any argument relating to the direct method of proof, nor does it acknowledge Greg's memo in which

---

[2] Stallard does not acknowledge this fact in either of its briefs on summary judgment. It finds support in the record, and the Court takes it as undisputed.

he expressed his "concern [that] if abbi [sic] gets pregnant or her/Shannon leave we are in a mess." (Filing No. 50-13 at 3.)

A defendant is entitled to summary judgment if it can "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). Stallard attempts to argue that there are no genuine issues of material fact, and that seems more or less to be correct.[3] But Stallard does not even attempt to show that it is entitled to judgment as a matter of law by explaining how the undisputed evidence negates an element of Jerles' pregnancy discrimination claim. The Court cannot discern whether Stallard believes it is entitled to summary judgment because it has negated both the direct method of proof and one of the four elements of the indirect proof. It is possible Stallard admits Jerles has made a *prima facie* claim for pregnancy discrimination and Stallard is attempting to win summary judgment on the second step of that analysis—that Stallard had a legitimate, non-pretextual reason to terminate Jerles.[4] But Stallard's brief on summary judgment neglects to explain why Stallard is entitled to judgment as a matter of law, and for that reason, the Court cannot grant, or even properly evaluate, its motion.[5] The Court need not address in depth whether any dispute of material fact exists because Stallard has not met its burden of demonstrating it is entitled to judgment as a matter of law.

---

[3] Because Stallard does not clearly articulate its legal theories, the Court cannot fully and accurately assess what facts are material to the resolution of this case.

[4] In the introduction section of its brief, Stallard contends that Jerles cannot establish a *prima facie* case for Title VII discrimination. (Filing No. 46 at 3.) But when fleshing out that argument later in the brief, Stallard recites the elements for establishing a *prima facie* claim of failure to promote, which Jerles is not trying to do. The Court is confused by Stallard's recitation of the wrong test.

[5] Stallard's reply brief, while acknowledging a few inconvenient facts ignored in the initial brief, still does not do an adequate job of explaining why Stallard is entitled to judgment as a matter of law. Even if the reply brief did address the framework, the Court would not consider arguments made for the first time in a reply brief.

Stallard's Motion for Summary Judgment is therefore **denied** as to Jerles' claim for Title VII pregnancy discrimination.

**B.     Retaliation**

To establish a retaliation claim under the direct method of proof, a plaintiff must show that: (1) she engaged in a statutorily protected activity, (2) she suffered an adverse employment action, and (3) there is a causal connection between the adverse action and the protected activity. *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012).

Under the indirect method of proof, a plaintiff must establish a *prima facie* case of retaliation. Then the employer must provide a legitimate, non-discriminatory reason for the adverse employment action.  Then the plaintiff must submit evidence that the employer's stated reason is pretextual.  *Stephens v. Erickson*, 569 F.3d 779, 786-87 (7th Cir. 2009).  To establish a *prima facie* case of retaliation, the plaintiff must show that: (1) she engaged in a statutorily protected activity, (2) she suffered an adverse employment action, (3) she was performing her job satisfactorily, and (4) she was treated less favorably than a similarly situated employee who did not complain of discrimination. *Id.*

Stallard addresses only the direct method of proof for retaliation, specifically the third prong.[6]  It asserts that "[t]here is no causal connection between any of Jerles's charges of discrimination and the reorganization and hiring efforts that ultimately led to" her termination and that "Stallard's decisions occurred before Jerles engaged in any protected activity." (Filing No. 46 at 20.)  Stallard refutes the claim contained in Jerles' Amended Complaint that "Stallard & Associates retaliated against Jerles for complaining about discrimination and for filing an EEOC

---

[6] Early in it's brief, Stallard claims that Jerles cannot "establish a prima facie case of discrimination or retaliation under the PDA." (Filing No. 46 at 3.) Stallard never develops this argument in the body of its brief as to the retaliation claim, so the Court considers it abandoned.

Charge, by stating that Jerles' job was in 'jeopardy'". (Filing No. 7 at 7.)  Stallard points out that Jerles was informed that her employment was in jeopardy three to four months before her EEOC Charge, when Joanna told Jerles that if Stallard did not find work for her Joanna "wasn't sure how much longer [Jerles] would have a role." (Filing No. 46 at 20-21.)[7]

That argument fails to carry Stallard's motion for two primary reasons.  First, it ignores inconvenient undisputed facts.  The evidence in the record shows that Jerles began to complain about pregnancy discrimination, without using those specific words, on December 12, 2019 at the latest.  (Filing No. 47-3 at 21.)  Any discrimination following that date, including the conversation Stallard describes between Joanna and Jerles, could constitute retaliation.  The timeline does not eliminate retaliation as a possible reason for declaring Jerles' job to be in jeopardy.

Second, the argument (and the rest of Stallard's brief) ignores the other method by which Jerles can demonstrate retaliation—the indirect method.  Stallard does not directly address any of the four components of a *prima facie* case for retaliation under the indirect method: whether (1) she engaged in a statutorily protected activity, (2) she suffered an adverse employment action, (3) she was performing her job satisfactorily, and (4) she was treated less favorably than a similarly situated employee who did not complain of discrimination. Without negating one of these elements, to show that it is entitled to judgment as a matter of law, Stallard must provide a legitimate, non-discriminatory reason for the adverse employment action.  To the extent Stallard tries to provide a legitimate, non-discriminatory reason, it fails.

Stallard's attempts to provide a legitimate reason for termination is the following paragraph at the end of its reply brief (internal record cites omitted):

> [Stallard] continued to search for projects for [Jerles] to keep her employed full-time, but [Jerles] struggled to adapt to new projects. In February of 2018, Joanna

---

[7] This phrase is styled as a record quotation in Stallard's brief, but the Court is unable to locate the quote at any of the three record cites that follow the sentence containing the quote.

>Stallard asked [Jerles] to draft a list of her concerns, what role she saw for herself in, and what goals she had with the company. [Jerles] responded saying "if we know what I am good at and capable of I feel like I should be put in that role." [Jerles] wanted to return to the administrative accounting position she held previously. [Stallard] had previously identified [Jerles'] inability to adapt to new projects and her propensity to get frustrated as areas for improvement in each of her performance evaluations, including those before [Jerles] became pregnant or started fertility treatment. Because [Jerles] was unable to perform the full range of functions needed, and with the hiring of Barker, who was able to perform the full range of functions needed, Stallard could not justify a full-time position for Jerles to perform only lower-level/administrative accounting functions.

([Filing No. 54 at 14-15](#).) This paragraph asserts several theories regarding why Stallard terminated Jerles' employment; however, it does not develop any one of them. The statement implies that Jerles did not want any of Stallard's open positions. But the evidence shows Jerles wanted to continue her employment at Stallard, as she made several attempts to arrange her return from maternity leave. The statement suggests Jerles was incompetent, and justifies her termination because of her poor performance. Again, the record, as read most favorably to Jerles, contradicts that assertion. Joanna constantly reassured Jerles that she would have a job when she returned from maternity leave ([Filing No. 47-3 at 116](#)), and on December 20, 2017, sent an email to every employee at the company stating that Jerles was taking time off in the summer for maternity leave but would then return. *Id.* at 179. The evidence, when interpreted most favorably to Jerles, does not show that performance was a consideration in her dismissal.

Stallard also argues that "the hiring of Barker," who was more qualified than Jerles, eliminated Stallard's need for an accounting employee. Stallard relies on this idea to its detriment throughout its briefing, as it never mentions that Barker left the company just a week after Jerles was scheduled to return from maternity leave, *leaving a vacancy in the accounting position that Jerles had once occupied*. Barker may well have done the job admirably, but by the time Jerles was ready to return from maternity leave, Barker was not "able to perform the full range of

18

functions needed," or perhaps she was able but unwilling to perform the duties of the job because she left to work for another company.

The facts presented in the light most favorable to Jerles establish that the understanding between Jerles and Joanna regarding her maternity leave was that if there were tasks she could do that needed doing when she was ready to return, a job would be open to her. Barker took care of those tasks while Jerles was on leave, but just as Jerles prepared to come back to work, Barker informed Stallard she was leaving. Barker's departure left tasks that needed doing, but rather than allowing Jerles to return and do them, Stallard terminated her. It is reasonable to infer from this set of facts that the reason Joanna did not hold up her end of the understanding was because Stallard retaliated against Jerles for complaining of pregnancy discrimination and filing an EEOC Charge.

The legitimate, non-pretextual justifications Stallard offers for terminating Jerles crumble under mild scrutiny. A common-sense reading of the undisputed facts supports Jerles' assertion that retaliation played a role in her termination. Jerles has made a *prima facie* case for retaliation that Stallard has not attempted to refute. To the extent that Stallard attempts to provide legitimate, non-discriminatory reasons for terminating Jerles, the Court finds that those reasons are irreconcilable with the evidence in the record. A reasonable jury examining the evidence in the record could find that Stallard retaliated against Jerles after she complained of discrimination. Accordingly, Stallard's Motion for Summary Judgment as to Jerles' retaliation claim is **denied**.

### IV. CONCLUSION

For the reasons stated above, Stallard's Motion for Summary Judgment ([Filing No. 45](#)) is **DENIED**. Jerles' Motion for Leave to File a Surreply ([Filing No. 59](#)) is **DENIED AS MOOT**. Jerles' claims for pregnancy discrimination under Title VII and retaliation remain pending for trial.

Case 1:19-cv-00856-TWP-DML   Document 75   Filed 08/10/20   Page 20 of 20 PageID #: 954

**SO ORDERED.**

Date: 8/10/2020

DISTRIBUTION:

Annavieve C. Conklin
DELANEY & DELANEY LLC
aconklin@delaneylaw.net

Kathleen Ann DeLaney
DELANEY & DELANEY LLC
kathleen@delaneylaw.net

Laurie E. Martin
HOOVER HULL TURNER LLP
lmartin@hooverhullturner.com

_____
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana